IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MEADE COMMUNITIES, LLC,
    *Plaintiff*,

    v.                          Civil Action No. ELH-21-1976

CASANDRA JONES
    *Defendant.*

**MEMORANDUM**

This suit began on August 5, 2021, when plaintiff Meade Communities, LLC ("Meade") filed a single-count complaint for breach of contract against defendant Casandra Jones. ECF 1 (the "Complaint"). Plaintiff alleges, *inter alia*, that Jones breached her contractual obligation to tender rent payments, as specified in a lease agreement, for her apartment located at Fort Meade ("Ft. Meade"). *Id.* ¶¶ 2, 5-17. Meade seeks, among other things, "[a] judgment for the amount determined to be due" and "[a]ttorney's fees and costs as provided for under the Subject Lease[.]" *Id.* at 4.[1] The Complaint is accompanied by three exhibits. *See* ECF 1-2; ECF 1-3; ECF 1-4.

As discussed, *infra*, the Court's subject matter jurisdiction is predicated on 28 U.S.C. § 1331. ECF 1, ¶ 3. This is because "the lease agreement at issue in this case involves a housing unit located on Ft. Meade, Maryland, a military installation under exclusive federal legislative jurisdiction." *Id.*; *see Stokes v. Adair*, 265 F.2d 662, 666 (4th Cir. 1959).

Plaintiff was served with a summons and a copy of the Complaint on  August 26, 2021.

---

[1] In the Complaint, Meade also sought "an Order of Eviction directing Jones and Residents, as listed and identified under the Subject Lease (redacted for privacy, minor, and contact information), to immediately vacate the Subject Premises and directing the United States Marshals Service to enforce the same." ECF 1 at 4. But, Jones has vacated the relevant property. ECF 15, ¶ 1. Therefore, Meade no longer seeks such an Order. *See id.* ¶ 15.

ECF 4.  But, to date, plaintiff has not responded to the Complaint.  *See* Docket.

The Clerk of the Court entered an "Order Of Default" on March 8, 2022.  ECF 13.  And, the Clerk of the Court then issued a "Notice Of Default" to Jones.  ECF 14.  Now pending is plaintiff's motion for default judgment, pursuant to Fed. R. Civ. P. 55(b)(2), seeking damages and costs totaling $14,416.00.  ECF 15 (the "Motion").  The Motion is supported by three exhibits. ECF 15-1; ECF 15-2; ECF 15-3.  The Motion also includes a Certificate of Service indicating that the Motion was mailed to Jones at an address she provided in an earlier submission.  *See* ECF 15 at 3 (Certificate of Service); ECF 8 at 3 (Jones's specification of her address).  However, Jones has not responded to the Motion, and the time to do so has expired.  *See* Local Rule 105.2(a).

No hearing is required.  *See* Local Rule 105.6.  For the reasons that follow, I shall grant the Motion.

## I.     Background

### A.

Meade alleges that it "owns and operates family housing located on Fort Meade, Maryland under the Department of Defense Military Housing Privatization Initiative (10 U.S.C. § 2871, *et seq.*)" ("MHPI").  ECF 1, ⁋ 1.[2]   Jones is a civilian who, at the time the Complaint was filed, "occupie[d] family housing owned and operated by Meade."  *Id.* ⁋ 2; *see* ECF 15-2, ⁋ 4 (attesting to Jones's civilian status).

---

[2] Under the terms of the MHPI, the Secretaries of the Armed Forces are empowered to invest "in eligible nongovernmental entities conducting projects for the acquisition or construction of housing units suitable for use as military family housing or as military unaccompanied housing." *Atlantic Marine Corps Comms., LLC v. Onslow County, N.C.*, 497 F. Supp. 2d 743, 747-48 (E.D.N.C. 2007) (citations and internal quotation marks omitted).  To that end, the MHPI, provides, among other things, for private companies to "lease[ ] land from the military" and serve as "the exclusive manager[s] of the property."  *Clover v. Camp Pendleton & Quantico Housing LLC*, 525 F. Supp. 3d 1140, 1144 (S.D. Cal. 2021).

Meade and Jones "executed a residential lease for the property on December 23, 2019." ECF 1, ⁋ 2; *see* ECF 1-2 (the "Lease").[3]  In particular, Jones leased the property at 3600 Mower Court #A, at Ft. Meade (the "Property").  ECF 1-2, ⁋ 1(a).  The term of the Lease ran for a period of one year, from December 23, 2019 to December 22, 2020.  *Id.* ⁋ 1(c).  The Lease provided that on the first day of each month of the Term, Jones was required to pay rent to Meade, in the amount of $1,880.00.  *Id.* ⁋ 1(d).  Under the Lease, "If the Owner fails to receive Resident's Monthly Rent payment on or before the close of business on the fifth day of the month in which it is due, a Late Charge . . . will be paid by Resident and collectible by Owner as Additional Rent for each month the Monthly Rent payment is overdue . . . ."  *Id.* ⁋ 4.  In accordance with this provision, the Lease specified that Meade could impose a "Late Charge" in the amount of "Five percent (5%) of the Monthly Rent."  *Id.* ⁋ 1(e) (emphasis omitted).  Moreover, if Jones failed to pay rent as required by the Lease, "the entire amount of Monthly Rent for the remainder of the Term may, at Owner's option, thereupon become immediately due and payable."  *Id.* ⁋ 4.

The Lease also specified that in the event Jones contravenes any provision contained therein, Meade is entitled to "institute any appropriate court action for any or all of the following: (i) repossession of the Home; (ii) all Monthly Rent then due; and (iii) all other damages sustained by Owner."  *Id.* ⁋ 27.  And, the Lease included a provision stating that Jones "agrees to pay any and all administrative, professional and attorneys [sic] fees and expenses, filing fees for litigation, and any other cost and expense (including but not limited to filing fees and sheriff or constable fees) incurred by Owner in enforcing the provisions of this [Lease] against Resident for any breach of this [Lease] by Resident . . . ."  *Id.* ⁋ 24.

---

[3] The Lease refers to Meade as "Owner" and Jones as "Resident."  ECF 1-2 at 2.  And, it uses the term "Home" to refer to the Property.  *Id.* ⁋ 1(a).

According to Meade, Jones "failed to pay rent in a timely manner pursuant to her lease agreement over an extended period of time." ECF 1, ⁋ 2.  Specifically, as of August 3, 2021, Jones owed Meade "in excess of $9,916.00 in rent and late fees."  *Id.* ⁋ 10; *see* ECF 1-3 ("Resident Ledger," dated August 3, 2021).  Further, "Jones was sent Notices of Unpaid Rent and Balance Due Statements."  ECF 1, ⁋ 11.[4]  But, as of the time of filing the Complaint, Jones had failed to pay the outstanding balance owed to Meade.  *Id.* ⁋ 12.

On March 10, 2020, "Meade provided Jones with written notice" specifying "that if the balance was not satisfied by April 13, 2020, Meade [would] file for breach of contract to recover Jones' outstanding balance and his [sic] eviction pursuant to the Subject Lease."  *Id.* ⁋ 13; *see* ECF 1-4 at 2.  However, due to the onset of the COVID-19 pandemic and the federal moratorium on evictions that followed, Meade did not move to evict plaintiff at that time.  *See* ECF 1, ⁋ 14 (specifying that Meade "honored the moratorium on evictions"); *see generally Ala. Assoc. of Realtors v. Dep't of Health and Human Services*, ___U.S.___, 141 S. Ct. 2485, 2486-2489 (2021) (describing the history of the federal eviction moratorium).

The term of the Lease expired on December 22, 2020.  ECF 1-2, ⁋ 1(c).  However, Jones did not vacate the Property at that time.  ECF 1, ⁋ 15-16.  Accordingly, on April 28, 2021, Meade mailed Jones another letter stating, ECF 1-4 at 3: "Please accept this letter as our notice that your Lease will not be extended or renewed.  The decision was based on delinquent rent in the amount of $4,114.00 and the refusal [to] discuss making satisfactory payment arrangements for the account."  Meade instructed plaintiff to "return all keys to [its] office no later than May 28, 2021 during regular business hours."  *Id.*  Nevertheless, Jones continued to reside at the Property in the

---

[4] Meade did not provide the Court with copies of these notices, nor did it otherwise specify the dates on which they were sent to Jones.

ensuing months.  ECF 1, ¶ 16.

**B.**

This suit followed on August 5, 2021.  ECF 1.  Thereafter, summons was returned executed on August 31, 2021, reflecting that service was personally effected on plaintiff on August 26, 2021. *See* ECF 4.  Pursuant to Rule 12 of the Federal Rules of Civil Procedure, defendant was required to respond to the suit by September 16, 2021, twenty-one days following her receipt of a copy of the summons and the Complaint.  But, Jones did not respond to the Complaint by that date.  *See* Docket.

Accordingly, on October 11, 2021, Meade filed a "Motion For Entry Of Default" (ECF 5), which was accompanied by two exhibits.  ECF 5-1; ECF 5-2.  On October 20, 2021, the Clerk entered an "Order Of Default," pursuant to Fed. R. Civ. P. 55(a).  ECF 6.  The Clerk also issued a "Notice Of Default" to Jones on October 20, 2021.  ECF 7 (the "First Notice").  It stated that Jones had 30 days in which to file a motion to vacate the Order Of Default.  *Id.*

Jones received the First Notice because on November 19, 2021, she filed a "Notice To Vacate Order Of Default."  ECF 8 (the "Motion to Vacate").  She stated, among other things, that she "caught" COVID-19 in April 2021, during her "high-risk pregnancy"; her rental unit had been "flooded with sewage water for the 5th time," without compensation to her; she had been in the "ICU"; her sister died; and Meade's maintenance workers damaged her Property.  *Id.* at 2-3. Moreover, around the time that she was served with the suit, she "delivered [her] child prematurely and remained hospitalized with [her] son until he was released."  *Id.* at 3.  Further, she advised that she was seeking to obtain rental assistance to help her meet her outstanding obligations to Meade. *Id.* at 3-5.

By Memorandum (ECF 9) and Order (ECF 10) of February 3, 2022, I granted the Motion

to Vacate, explaining that Jones had promptly responded to the Order of Default and provided the Court with adequate grounds to excuse her failure to comply with the procedural requirements of the Federal Rules.  ECF 9 at 4.  Accordingly, I afforded defendant another opportunity to respond to the Complaint, due by February 25, 2022.  *Id.* at 5.  However, Jones failed to do so by that date, or at any time thereafter.  *See* Docket.

On March 8, 2022, Meade filed a renewed "Motion for Clerk's Entry of Default" (ECF 12), supported by one exhibit.  ECF 12-1.  On the same date, the Clerk entered an "Order Of Default," pursuant to Fed. R. Civ. P. 55(a) (ECF 13, the "Renewed Order Of Default"), and mailed a notice to Jones of the same.  ECF 14 (the "Second Notice").  The Second Notice advised Jones that she had 30 days to respond to the Renewed Order of Default.  *Id.*  Nonetheless, plaintiff failed to respond.

Thereafter, on April 5, 2022, plaintiff filed the Motion, asking the Court to award a default judgment against plaintiff.  ECF 15.  In relevant part, plaintiff states that Jones is "a civilian who previously resided at family housing owned and operated by Meade . . . ."  *Id.* ¶ 1.  Thus, it appears that Jones no longer resides at the Property.

The Motion seeks money damages in the amount of $13,864.00.  *Id.* ¶ 15.  In support of its claim, Meade has provided the Court with an updated version of the "Resident Ledger," dated October 18, 2021.  ECF 15-3 (the "Ledger") at 1.  Consistent with the Motion, the Ledger reflects that Jones owes Meade a total sum of $13,864.00.  *Id.* at 2.  This sum represents unpaid rent plus late charges.

Meade also provided the Court with an "Affidavit In Support Of Judgment By Default" which is authored by Christie Taylor, Meade's "Community Manager."  ECF 15-2 (the "Affidavit") at 1.  In the Affidavit, Taylor states, *inter alia*, that Meade incurred $552.00 in

expenses related to this suit, *i.e.*, costs associated with securing a process server and paying the Court's filing fee.  ECF 15-2 at 2.

The Motion does not expressly request recovery of these additional expenses.  However, Meade's proposed Order asks the Court to award "[a] judgment for back rent owed in the amount of $13,864.00" and "reasonable attorneys [sic] costs in the amount of $552.00, for a total monetary judgment of $14,416.00."  ECF 15-4.  Therefore, I shall construe the Motion as requesting the recovery of an additional $552.00 in costs associated with bringing this litigation.

## II.      Standard of Review

Rule 55(b) of the Federal Rules of Civil procedure governs default judgments.   In particular, Rule 55(b)(1) provides that the clerk may enter a default judgment if the plaintiff's claim is "for a sum certain or a sum that can be made certain by computation."[5]  But, "[a] plaintiff's assertion of a sum in a complaint does not make the sum 'certain' unless the plaintiff claims liquidated damages; otherwise the complaint must be supported by affidavit or documentary evidence."  *Monge v. Portofino Ristorante*, 751 F. Supp. 2d 789, 794 (D. Md. 2010) (Grimm, M.J.).[6]

Entry of default judgment under Rule 55(b)(2) "is left to the discretion of the court."  *SEC v. Lawbaugh*, 359 F. Supp. 2d 418, 421 (D. Md. 2005).  But, the Fourth Circuit has a "strong policy favoring the disposition of cases on the merits . . . ."  *Rangarajan v. Johns Hopkins Univ.*, 917

---

[5]  If the sum is not certain or ascertainable through computation, the court looks to Rule 55(b)(2) ("The court may conduct hearings or make referrals--preserving any federal statutory right to a jury trial--when, to enter or effectuate judgment, it needs to: (A) conduct an accounting; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter.").

[6] Judge Grimm authored *Monge* when he served as a United States Magistrate Judge.  He now serves as a United States District Court Judge.

F.3d 218, 229 (4th Cir. 2019) (discussing *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 462 (4th Cir. 1993)), *cert. denied*, ___U.S.___, 139 S. Ct. 2762 (2019); *see Projects Mgmt. Co. v. Dyncorp Int'l LLC*, 734 F.3d 366, 376 (4th Cir. 2013). However, the policy is not absolute.  Thus, default judgment "'is appropriate when the adversary process has been halted because of an essentially unresponsive party.'"  *Garnier-Thiebault, Inc. v. Castello 1935 Inc.*, SDT-17-3632, 2019 WL 6696694, at *1 (D. Md. Dec. 6, 2019) (Thacker, J.) (quoting *Int'l Painters & Allied Trades Indus. Pension Fund v. Cap. Restoration & Painting Co.*, 919 F. Supp. 2d 680, 684 (D. Md. 2013)); *see Lawbaugh*, 349 F. Supp. 2d at  421.

In the case of a default judgment, all of plaintiff's factual allegations, other than those pertaining to damages, are deemed admitted.  *See* Fed. R. Civ. P. 8(b)(6); *see also Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001) (stating that the court accepts as true the well pleaded factual allegations in the Complaint as to liability).  But, the court must determine whether the undisputed factual allegations constitute a legitimate cause of action.  *Id.* at 780-81.

If the court is satisfied that liability has been established, it must then determine the appropriate amount of damages.  *Ryan*, 253 F.3d at 780-81.  Allegations "relating to the amount of damages" are not deemed admitted based on a defendant's failure to respond to a suit. Fed R. Civ. P. 8(b)(6); *see Monge*, 751 Supp. 2d at 794; *Trs. Of the Elec. Welfare Trust Fund v. MH Passa Elec. Contracting, Inc.*, DKC-08-2805, 2009 WL 2982951, at *1 (D. Md. Sept. 14, 2009) ("Upon default, the well-pled allegations in a complaint as to liability are taken as true, although the allegations as to damages are not."); *Pentech Fin. Servs., Inc. v. Old Dominion Saw Works, Inc.*, No. 6:09cv00004, 2009 WL 1872535, at *1 (W.D. Va. June 30, 2009) ("Upon default judgment,

Plaintiff's factual allegations are accepted as true for all purposes excluding determination of damages.").

Rather, the court must make an independent determination regarding allegations as to damages. *See Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 154 (2d Cir. 1999). In so doing, the court may conduct an evidentiary hearing. Fed. R. Civ. P. 55(b)(2). However, the court may also make a determination of damages without a hearing, so long as there is an adequate evidentiary basis in the record to support an award of the requested damages. *See Adkins v. Teseo*, 180 F. Supp. 2d 15, 17 (D.D.C. 2001) ("[T]he court may rely on detailed affidavits or documentary evidence to determine the appropriate sum."); *see also Trustees of the Nat'l Asbestos Workers Pension Fund v. Ideal Insulation*, Inc., ELH-11-832, 2011 WL 5151067, at *4 (D. Md. Oct. 27, 2011) (determining that, in a case of default judgment against an employer, "the Court may award damages without a hearing if the record supports the damages requested"); *Monge*, 751 F. Supp. 2d at 795 (same); *Pentech Fin. Servs., Inc.*, 2009 WL 1872535, at *2 (concluding that there was "no need to convene a formal evidentiary hearing on the issue of damages" after default judgment because plaintiff submitted affidavits and records establishing the amount of damages); *JTH Tax, Inc. v. Smith*, Civil No. 2:06CV76, 2006 WL 1982762, at *3 (E.D. Va. June 23, 2006) ("If the defendant does not contest the amount pleaded in the complaint and the claim is for a sum that is certain or easily computable, the judgment can be entered for that amount without further hearing.").

Pursuant to Fed. R. Civ. P. 54(c), "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." *See In re Genesys Data Techs, Inc.*, 204 F.3d 124, 132 (4th Cir. 2000) ("When a Complaint demands a specific amount of damages, courts have generally held that a default judgment cannot award additional damages."). This is meant to

enable the defendant to decide whether to expend the resources to defend the action. *Monge*, 751 F. Supp. 2d at 796.

### III.     Jurisdiction[7]

As mentioned, this suit is predicated on the Court's federal question jurisdiction. According to plaintiff, defendant "is not in the active military." ECF 15-2 at 1.  And, the Lease "involves a housing unit located on Ft. Meade, Maryland, a military installation under exclusive federal legislative jurisdiction." ECF 1, ⁋ 3.  Thus, although plaintiff does not expressly make this point, the Court's jurisdiction rests on Article I, Section 8, Clause 17 of the United States Constitution, which is known as the Enclave Clause.

In relevant part, the Enclave Clause provides, U.S. Const. Art. I, § 8, cl. 17:

Congress shall have Power . . . To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings[.]

This provision grants the federal government exclusive legislative jurisdiction over lands obtained pursuant to this clause, or "enclaves."  In *Surplus Trading Co. v. Cook*, 281 U.S. 647, 652 (1930), the Court said: "It has long been settled that where lands for such a purpose are purchased by the United States with the consent of the State legislature, the jurisdiction theretofore residing in the state passes, in virtue of the constitutional provision, to the United States, thereby making the jurisdiction of the latter the sole jurisdiction."  *See Akin v. Ashland Chem. Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998).

---

[7] Federal courts "have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it."  *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010).

Courts have held that federal question jurisdiction exists over claims that arise on federal enclaves.  *See Stokes v. Adair*, 265 F.2d 662, 666 (4th Cir. 1959); *see also Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006) ("Federal courts have federal question jurisdiction over tort claims that arise on 'federal enclaves.'") (citations omitted); *Akin*, 156 F.3d at 1034 ("Personal injury actions which arise from incidents occurring in federal enclaves may be removed to federal district court as a part of federal question jurisdiction."); *Willis*, 555 F.2d at 726; *Mater*, 200 F.2d at 124; *Hall v. Coca-Cola Co.*, Civ. No. MSD-18-0244, 2018 WL 4928976, at *2–3 (E.D. Va. Oct. 11, 2018); *Federico v. Lincoln Military Hous.*, 901 F. Supp. 2d 654, 664 (E.D. Va. 2012).  The general reasoning of these courts is that any claim that arises on a federal enclave is necessarily a creature of federal law because, quite simply, there is no other law.  *See Mater*, 200 F.2d at 124 ("[A]ny law existing in territory over which the United States has exclusive sovereignty must derive its authority and force from the United States and is for that reason federal law."); *Hall*, 2018 WL 4928976, at *2.

Further, under the Enclave Clause, "a State may not legislate with respect to a federal enclave unless it reserved the right to do so when it gave its consent to the purchase by the United States."  *Paul v. United States*, 371 U.S. 245, 268 (1963).   As a result, "only state law existing at the time of the acquisition remains enforceable, not subsequent laws."  *Id.*

Stated differently, "whether state law applies on a federal enclave depends on whether the state law in question was in existence at the time of the cessation."  *Weisel v. Kametrix, LLC*, JKB-19-3281, 2020 WL 2112157, at *3 (D. Md. May 1, 2020). Accordingly, "future statutes of the state are not a part of the body of laws in the ceded area," as "Congressional action is necessary to keep [the laws of the federal enclave] current."  *James Stewart & Co. v. Sadrakula*, 309 U.S. 94, 100 (1940).  Moreover, "[s]ubsequent state common law also does not apply" on federal enclaves.

*JAAAT Tech. Servs., LLC v. Tetra Tech Tesoro, Inc.*, 3:15-cv-235, 2017 WL 4003026, at *3 (E.D. Va. Sept. 11, 2017) (citing *Allison v. Boeing Laser Tech. Servs.*, 689 F.3d 1234, 1240 (10th Cir. 2012)).

At bottom, "the law in force on federal enclaves, although derived from state law, becomes exclusively federal law once the enclave is ceded to the federal government.[ ]" *JAAAT Tech. Servs., LLC*, 2017 WL 4003026, at *4 (citing *Pac. Coast Dairy v. Dep't of Ag. of Cal.*, 318 U.S. 285, 294 (1943)); *see also Stokes*, 265 F.2d at 665 ("[O]nly the state laws in effect at the time of the transfer of jurisdiction continue in effect and . . . subsequent statues of the state are not part of the laws of the ceded area unless Congress takes action to keep them current."). And, "'where exclusive jurisdiction is ceded to the United States, the laws of the state at the time of cession will continue in effect as federal law, and subject matter jurisdiction under 28 U.S.C. § 1331 is proper.'" *Federico*, 901 F. Supp. 2d at 665  (citation omitted).

Of import here, judges of this Court have previously recognized that Ft. Meade is a federal enclave.  *See Colon v. United States*, 320 F. Supp. 3d 733, 745-47 (D. Md. 2018);  *Baltimore Gas and Elec. Co. v. United States*, 133 F. Supp. 2d 721, 744 (D. Md. 2001).  Indeed, in 1906, Maryland passed a statute providing authority to cede the territory which was to become Ft. Meade to the federal government.   *See Baltimore Gas and Elec. Co.*, 133 F. Supp. 2d at 742-44 (discussing legislative history of Ft. Meade).  That statute said, in relevant part, *id.* at 742 (quoting Chapter 743 of the 1906 Laws of Maryland, AR Tab 16):

1. Be it enacted by the General Assembly of Maryland, That the consent of the State of Maryland is hereby given in accordance with [the Enclave Clause] . . . by purchase, condemnation of otherwise of any land in this State required for sites for custom houses, courthouses, post offices, arsenals or other public buildings whatever, or for any other purposes of the government.

2. That exclusive jurisdiction in and over any land so acquired by the United States shall be and the same is hereby ceded to the United States for all purposes

except the service upon such sites of all civil and criminal process of the courts of this State, but the jurisdiction so ceded shall continue no longer than the United States shall own such lands.

3. The jurisdiction shall not vest until the United States shall have acquired the title to said lands by purchase, condemnation otherwise; and so long as the said lands shall remain the property of the United States when acquired as aforesaid, and no longer, the same shall be and continue exempt and exonerated from all State, county and municipal taxation, assessment, or other charges which may be levied or imposed under the authority of this State.

Pursuant to this authority, the federal government established Ft. Meade in 1917. *Baltimore Gas and Elec. Co.*, 133 F. Supp. 2d at 742. In view of the foregoing, I am satisfied that Ft. Meade qualifies as a federal enclave. *See Weisel*, 2020 WL 2112157, at *3 (observing the same); *Norair Eng'g Corp. v. URS Federal Servs., Inc.*, RDB-16-1440, 2016 WL 7228861, at *3 (D. Md. Dec. 14, 2016) (similar).

As Meade indicates, the Complaint arises out of events that relate to the Property, which is located on Ft. Meade. *See* ECF 1, ⁋ 3; ECF 1-2, ⁋ 1(a). Further, plaintiff's claim is a breach of contract claim that was, of course, a cognizable cause of action at the time the area that became Ft. Meade was ceded to the federal government. *See*, *e.g.*, *Morgart v. Smouse*, 103 Md. 463, 63 A. 1070 (1906). Therefore, plaintiff's claim is cognizable as a federalized State law claim, and the Court has subject matter jurisdiction. *See Federico,* 901 F. Supp. 2d at 665.

## IV.    Discussion

As noted, the Complaint advances a claim for breach of contract for failure to pay rent, as required by the Lease. ECF 1, ⁋⁋ 5-15. Generally speaking, a contract is defined as "a promise or set of promises for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." RICHARD A. LORD, 1 WILLISTON ON CONTRACTS § 1:1 (4th ed. 1990) ("Williston on Contracts"); *accord* RESTATEMENT (SECOND) OF CONTRACTS § 1 (1981). Moreover, "a breach of contract is defined as a 'failure, without legal excuse, to perform any

promise that forms the whole or part of a contract.'"   *Weaver v. ZeniMax Media, Inc.*, 175 Md. App. 16, 51, 923 A.2d 1032, 1052 (2007) (citing Williston on Contracts § 63:1).[8]

Meade alleges that, pursuant to the Lease, defendant assumed a contractual obligation to pay rent in the manner and amount specified by the Lease but failed to comply with her contractual obligation.  ECF 1, ¶¶ 5-17.  Plaintiff's allegations are supported by copies of the Lease (ECF 1-2), as well as the Ledger, which documents Jones's failure to pay rent as required by the Lease.  *See* ECF 15-3.  And, given the posture of the case, plaintiff's allegations are deemed admitted.  Fed. R. Civ. P. 8(b)(6).  Thus, I am satisfied that Meade has established Jones's liability.

As to the amount of damages, Meade asserts that, pursuant to the terms of the Lease, the defendant owes the sum of $13,864.00, which constitutes the amount due for unpaid rent plus late charges.  ECF 15, ¶ 15.  The amount is corroborated by the Ledger.  *See* ECF 15-3.  Accordingly, I am satisfied that plaintiff has adequately demonstrated that Jones is liable to plaintiff in the amount of $13,864.00.

Plaintiff also seeks costs in the amount of $552.00.  This sum reflects the expenses Meade incurred to file suit in this Court and to effect service on plaintiff.  *See* ECF 15-4.  Notably, 28 U.S.C. § 1920(1) provides: "A judge or clerk of any court of the United States may tax as costs," among other things, "[f]ees of the clerk and marshal[.]"   However, under 28 U.S.C. § 1924, "[b]efore any bill of costs is taxed, the party claiming any item of cost or disbursement shall attach thereto an affidavit, made by himself or by his duly authorized attorney or agent having knowledge

---

[8] As mentioned, plaintiff's claim relies on Maryland contract law as it existed at the time Ft. Meade was ceded to the federal government.  For present purposes, however, it is sufficient to note that the basic components of a breach of contract claim have remain unchanged since 1906.  *See generally Morgart*, 103 Md. 463, 63 A. 1070; *Vogeler v. Devries,* 98 Md. 302, 56 A. 782 (1904); *Hand v. Evans Marble Co. of Baltimore City*, 88 Md. 226, 40 A. 899 (1898).

of the facts, that such item is correct and has been necessarily incurred in the case and that the services for which fees have been charged were actually and necessarily performed."

Additionally, Local Rule 109.1 provides the mechanism pursuant to which a party may request an award of costs. It provides, in part: "In any case where any costs other than the fee for filing the action are being requested, the bill of costs shall be supported by affidavit and accompanied by a memorandum setting forth the grounds and authorities supporting the request. Any vouchers or bills supporting the cost being requested shall be attached as exhibits." Local Rule 109.1(b)

The Affidavit is the only documentation that accompanies the Motion in support of the request for the cost of the filing fee and the process server. ECF 15-2. And, the Affidavit merely states that plaintiff seeks costs in the amount of $552.00; it does not break down that sum into its component parts. *Id.* at 2.

Nonetheless, the record corroborates plaintiff's request. The Docket indicates that plaintiff paid a filing fee in the amount of $402.00. *See* Docket.[9] And, the filing fee incurred by Meade is recoverable under 28 U.S.C. § 1920(1).

Regarding the process server fee, plaintiff did not attach any documentation to the Motion evidencing the expense it incurred in the process of serving Jones with notice of this suit. However, the Proof Of Service, completed by the process server under penalty of perjury, reflects that the process server charged Meade $150.00 to effect service on Jones. *See* ECF 4.

Accordingly, I shall award plaintiff the costs for filing suit and for the cost of effecting service.

---

[9] The Court may take judicial notice of its own Docket. *See* Fed. R. Evid. 201; *see also Anderson v. Fed. Deposit Ins. Corp.*, 918 F.2d 1139, 1141 n.1 (4th Cir. 1990) (explaining that a district court may "properly take judicial notice of its own records").

## V.    Conclusion

In light of the foregoing, I shall grant the Motion.  I shall award judgment in favor of plaintiff in the total amount of $14,416.00.

An Order follows.


Date:   July 21, 2022                              _____/s/_____
                                                  Ellen Lipton Hollander
                                                  United States District Judge